IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

ERNESTO MORALES CASTRO,

Defendant.

CRIMINAL NO.  12-229 (FAB)

**REPORT AND RECOMMENDATION**

**INTRODUCTION**

On March 13, 2012, a state search warrant was issued by a Municipal Judge from the Superior Court of San Juan for the real estate property identified as Apartment 77, Building 7, Jardines de Cupey Public Housing Project in San Juan, Puerto Rico.  It was supported by a sworn statement by Agent Carlos Concepción-Ramos (hereafter "Agent Concepción-Ramos") of the Puerto Rico Police Department.[1]

On March 21, 2012, the search warrant was executed by state law enforcement officers resulting in the search of defendant Ernesto Morales-Castro's (hereafter "defendant Morales") home where a weapon and some pills were seized.   Federal agents were called to participate while defendant Morales and his wife were detained at the Puerto Rico Police Hato Rey West station as a result of the search of the residence and the evidence therein seized.  It was then determined that federal jurisdiction would be assumed.  After ICE Special Agent Luis Fombellida (hereafter "SA Fombellida") interviewed defendant, he was

---

[1] *See* Exhibit N of the suppression hearing.

then  informed a K-9 had alerted to defendant's vehicle which had been taken to the Puerto

Nuevo Headquarters, the "Comandancia." Once at the "Comandancia", defendant Morales

provided a written waiver as to his rights and a verbal consent to search the vehicle.

Defendant Morales was present during the search of his vehicle, accompanied by an

individual identified as Neftalí, who stated he was there on behalf of Morales' legal

representative.  Automatic weapons and ammunition were  found upon encountering a

secluded space underneath the vehicle floor with a hydraulic system to open same.

Defendant Morales was then charged with federal violations to Title 21, United States

Code, Section 841(a)(1) regarding the possession of oxycodone pills, a Schedule II

Controlled Substance (Count One); possession of firearms in furtherance of a narcotic

offense, Title 18, United States Code, Section 924(c)(1)(A) (Count Two); and illegal

possession of a machine gun a violation to Title 18, United States Code, Section 922(o) and

924(a)(2) (Count Three).   (Docket No. 8).

Defendant Morales filed a Motion to Suppress evidence derived from the search of

his residence pursuant to a state search warrant which resulted in federal jurisdiction to be

entertained for firearms and controlled substances violations. As a result of defendant's

subsequent arrest, evidence was also retrieved by federal law enforcement agents from

defendant Morales' impounded vehicle after having provided consent, which defendant now

contests should be considered fruit of the poisonous tree and also excluded.   (Docket No.

26).

United States of America v. Ernesto Morales Castro
Criminal No. 12-229 (FAB)
Report and Recommendation
Page 3

_____

In essence, defendant Morales submits in the request to suppress evidence from his residence that Agent Concepción-Ramos' affidavit in support of the state search warrant was false because he was not involved in the alleged surveillance of the premises as therein contained.  Such falseness is to be presumably established from the call records of Agent Concepción-Ramos' cell phone for the dates in which the surveillance was claimed to have taken place.  Counsel for defendant Morales also avers the subsequent evidence obtained from the search of defendant's vehicle is but fruit of the poisonous tree from defendant 's initial arrest because of the state search warrant and argues there was no consent for the search of the vehicle.

On July 5, 20012, the Court referred the motion to suppress to this Magistrate Judge for report and recommendation.  (Docket Nos. 27 and 28).  Thereafter, defendant's Supplemental Motion with the corresponding English language translation of the state search warrant was filed.  (Docket No. 32).  The government filed a reply opposing suppression and submitting a Frank's hearing should not be entertained. It further clarified a consent search, without a warrant, of defendant Morales' vehicle resulted in the return of a federal indictment for numerous violations as to evidence subsequently obtained after defendant Morales' initial state arrest and home search. (Docket No. 33).  Defendant Morales then filed a reply  submitting an affidavit in support of a Frank's hearing and several attachments with the proffer of being able to establish the lack of veracity of the

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 4

statements presented to the state court by the state police officer in the sworn statement which supported the search warrant and as a consequence the initial arrest of defendant Morales.  (Docket Nos. 46 and 47).

The evidentiary hearing was scheduled and entertained by this Magistrate Judge on September 18-21 and 24-25, 2012.  Multiple exhibits were admitted into evidence.[2] (Docket Nos. 65-70).   The parties requested and filed their respective post-hearing memoranda subsequent to the hearing.  (Docket Nos. 71 and 74).

## LEGAL DISCUSSION

### I.   Frank's Hearing.

### A.   Summary of Testimonies.

Counsel for defendant Morales contend they presented sufficient evidence to establish the falsity of the statements in support of the state search warrant.  However, this Court's perusal of defendant's proposed findings of fact determines these are not supported by the evidence presented.  Neither are his conclusions of law.  (Docket No. 71).  This Magistrate Judge will consider the evidence presented as reflected in the transcripts of the proceedings held.  (Docket Nos. 59-62).

Defendant Morales presented the testimony of Agent Concepción-Ramos who testified he is a Puerto Rico Police officer at the Criminal Information Division-Search Office, with headquarters in Puerta de Tierra.  On February 22, 2012, Agent Concepción-

---

[2] Exhibits II and Exhibit 3 were admitted into evidence subject to translations to the English language being filed. On October 31, 2012, an Order was entered to this effect inasmuch as the translations had not been filed. (Docket No. 75).

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 5

Ramos reported to work around 9:45 a.m. and was told by one Agent Jaume[3]  having information about firearms and drugs from an informant.  Agent Concepción-Ramos told his supervisor Sergeant Vázquez he was going to interview the informant whom he had never met before.  Together with Agent Jaume and other officers, Agent Concepción-Ramos went to interview the informant in the area of Cupey which took about an hour.  Said informant is paid by the Puerto Rico Police and had given information before to other agents.  Agent Jaume was the one acquainted with the informant and the informant was considered reliable.  After said interview, Agent Concepción-Ramos was told by Sergeant Vázquez to wait for some fellow officers and then go to the public housing project at Jardines de Cupey where the informant had communicated there was a building and an apartment number, and the description of two individuals, who were to be subject of the investigation. Agent Concepción-Ramos then went in an unmarked undercover SUV Dodge Ram pick-up vehicle, with dark color leather seats and tinted windows on the sides, to the Jardines de Cupey Public Housing Project while other officers in patrol cars stayed outside in the perimeters.  Agent Concepción-Ramos entered the  public housing project around 1:30 p.m., having binoculars and a communication radio.  Agent Concepción-Ramos does not remember if he had a cell phone on that day or if he took the cell phone to work that day

---

[3]  The transcripts of the suppression hearing present this agent's name as Halme, while Exhibit N spells same agent name as "Jaume", which is phonetically equivalent.  Still, there is no confusion we are referring to the same individual, the one with badge #34631.

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 6

since he does not take the cell phone with him every day.  When Agent Concepción-Ramos does not take the cell phone, he uses the Puerta de Tierra Headquarters' phone lines or uses the cell phone of some other officers.

On that day of February 22, 2012, Agent Concepción-Ramos identified Building 7 and the two apartments described by the informant.  He parked the Dodge RAM vehicle in the parking area that lies in front of the building which is about a hundred feet from the two apartments under surveillance.  Agent Concepción-Ramos described the apartment located on the second level as having iron grill work at the gate, white in color, and being located to the right, if standing in front of the building.  It had no visible apartment number.  The other apartment described by the informant was observed on the third floor of the building to the left and had its number visible as # 77.  The building is four stories, cream color, with green trims.  Agent Concepción-Ramos, while conducting his observations, never got out of his vehicle, which was parked in reverse so he could observe the apartment on the third level.[4]

Agent Concepción-Ramos observed during the surveillance two individuals coming out from the second level apartment, the one with the white iron gate.  One was dark skinned, thin and young, with a white shirt; the other was short and chubby, with a black shirt.[5]  The dark skinned individual was carrying a green purse in his right hand. Based on

_____

[4] Agent Concepción-Ramos' rough notes in the Spanish language were produced to defense counsel during the hearing.

[5] Exhibit N describes more thoroughly said individuals: "a dark-skinned individual, young, thin, white shirt, black short jeans, carrying a green bag and a young individual with white skin, 180 pounds approximately, 5'7" tall came, black shirt, short blue jeans..." (Docket No. 32-1, p. 2).

the descriptions provided, the two individuals Agent Concepción-Ramos observed coming down the steps were those previously identified by the informant.  The informant described an individual with white skin, short and stocky named "Néstor", as the one who lived in the third level apartment.  The other individual, the one living in the iron grilled apartment at the second level, had a nick name of "David", but no physical description was provided.

Agent Concepción-Ramos used his binoculars to see if anything could be seen in the green purse held by one of the individuals, the white skinned male, and observed in the right-hand pocket the grip which, based on his knowledge and experience, was a firearm. The observation was made from a distance of eighty to one hundred feet after 1:30 p.m. of a sunny day.  Agent Concepción-Ramos was able to see the two individuals, including the one with the firearm when they were below, at the stairwell, walking almost to the outside on the first level.  Agent Concepción-Ramos used his hand held radio to notify Agent Jaume, who was outside and near the Jardines de Cupey Public Housing Project, the description of the two individuals.  Agent Jaume was then coming into the housing project to verify and once the marked police car came in, Agent Concepción-Ramos exited the location where he had remained for less than an hour.  Agent Concepción-Ramos, while exiting, saw both individuals walking to the rear of the building and then lost sight of them. Agent Concepción-Ramos left towards a nearby house development and stayed there until Agent Jaume went in and checked everything out.  Agent Concepción-Ramos went back to the office. Agent Jaume informed Agent Concepción-Ramos later that the dark skinned

individual threw out the green purse and was found containing several ammunition of nine millimeter caliber.

On Saturday March 10, 2012, Agent Concepción-Ramos went back to the public housing project, after first reporting to the Puerta de Tierra Headquarters. He arrived around 1:00 pm. Agent Concepción-Ramos then went back to the site once more on Sunday, March 11, 2012, and parked in the same area in front of the building under surveillance where he had visibility to both apartments. On Sunday, Agent Concepción-Ramos heard several detonations and asked Sergeant Vázquez if he had heard them also, which was affirmative. From the parking lot Agent Concepción-Ramos saw a white skinned individual, short, stocky, with a green shirt, running from the rear of the building and carrying a black color firearm on his right hand, went up the stairs and entered Apartment #77. After several minutes, Agent Concepción-Ramos saw three motorbikes, to wit, a black one, another black and red, and a yellow one (Vento type motorcycles) but could not see their plate numbers because they were parked on the side of the building. An individual with a red shirt and braids pulled out a phone and began speaking. After several minutes, another individual came out of Apartment #77, wearing a blue shirt.[6] He went down the stairs and greeted the individuals with the motorbikes. The latter was carrying a black bag

---

[6] Exhibit N describes the individual coming from Apartment #77 as: "white skinned, young, black-haired individual of approximately 170 pounds 5'6" in height, blue shirt, short jeans... carrying a black Backpack type bag..." (Docket No. 32-1, p. 3).

and delivered it to the individual with the braids.[7]  Inside the bag and inside the sack there were numerous small plastic transparent bags with white powder inside and another plastic bag which, based on Agent Concepción-Ramos' experience, was chopped marijuana.  The individual who came out of Apartment #77, with the blue shirt, made delivery of a bag to each individual with the motorbikes, who took them and stored them inside the motorbikes' seats.  The size of the bag was a zip-lock one gallon bag and Agent Concepción-Ramos observed these bags from a distance of sixty to one hundred feet, having also his binoculars.  The individual with the blue shirt went back to Apartment #77, after speaking for several minutes and exchanging greetings.

Agent Concepción-Ramos only took photographs of the building, not of the individuals, for he was in front of them and a camera with its flash could be seen from inside his parked vehicle.  The informant did not provide a description of the individuals in the motorbikes and it was not confirmed who they were.

Agent Concepción-Ramos does not remember either if on Saturday, March 10, 2012, or Sunday, March 11, 2012, he had a cell phone with him for the cell phone at issue is not his and for law enforcement business purposes he has prepaid phones.  Usually for surveillance jobs Agent Concepción-Ramos does not like to have a cellular phone.  On

---

[7]  Exhibit N describes more thoroughly these individuals as: " ...one of them with dark skinned, young, thin, black hair, black a sleeveless T-short, short blue jeans, black motorcycle; the other one dark skinned, young, with braids, thin, red shirt, black sport pants, red and black motorcycle; and a white skinned individual, young, thin, close-cropped black hair, white shirt, white sports pan with black lines, yellow motorcycle."  (Docket No. 32-1, p. 3).

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 10

Sunday, March 11, 2012, Agent Concepción-Ramos communicated with Sergeant Vázquez, who was nearby in the urban development, in regards with the detonations they heard, by portable radio.

During cross-examination, Agent Concepción-Ramos identified defendant Morales as the individual he saw with a firearm and drugs during the surveillance. During re-direct examination by counsel for defendant, Agent Concepción-Ramos stated he made two separate search warrant applications on the same date to the state court, but only one was approved, the one for Apartment #77.

Thus, having considered the testimony of Agent Concepción-Ramos in court, as well as the exhibits submitted, including the sworn statement attached to the state warrant application, the evidence is consistent as to the events leading to the search of defendant Morales' residence at Apartment #77, which resulted in defendant's initial state arrest.

Defendant also presented the testimony of Mr. William Rivera-Rivera, security services coordinator for Claro.[8]  Mr. Rivera-Rivera is the custodian of records at Claro an he received a subpoena from defense counsel George's office for a particular cell phone under the name of Carlos Concepción-Rojas, to wit, (787) 667-2727.  Mr. Rivera-Rivera referred the subpoena to Claro's legal division which approved the same.  Mr. Rivera-Rivera sent by email the subpoenaed records to counsel George.  These records are kept as part of Claro's normal course of business and contain for example the following: type of service,

---

[8] The testimony on direct and cross examination of Mr. Rivera-Rivera was not recorded by the FTR System for unknown reasons.  As such, his testimony is not included in the transcripts of the hearing and is summarized herein in accordance with the undersigned's notes taken during the hearing.

information of the client/subscriber (ie. Social Security number, contact information, date of activation of the cell phone, payments made, account's balance, among others), details of calls made and received from said cell phone, identification of source sites for Claro, among other information. The CD containing Claro's records was admitted at Exhibit A.

Attempting to contradict the above surveillance evidence presented in support of the state search application, defendant Morales then submitted the testimony of his expert witness, a private investigator from New York, Mr. Dennis Suárez, who analyzed and explained in chronological order the cell phone records obtained in regard to Agent Concepción-Ramos from Claro cell phone company. Pursuant to the subpoenaed documents, counsel for defendant Morales presented documentation which contained call details and historical cell site information for the dates of February 21 and on March 10th and 11th of 2012, when Agent Concepción-Ramos swore the state affidavit in support of the search warrant to conduct the surveillance as to the apartment property of defendant Morales at Building #7, Apartment 77, at Jardines de Cupey Public Housing Project. (Exhibits K, L and N).

Mr. Suárez is an investigator retained by defendant Morales' counsel who has experience working with many phone companies and in dealing with cell phone interceptions. After *voir dire*, Mr. Suárez was allowed to testify as an expert limited to phone, data and toll analysis. On said issues, Mr. Suárez presented the CD from Claro which was previously admitted by the Court in regard with a combination of cell phone call details and cell site information beginning on February 22, 2012 and ending in March 21,

_____

2012, the date of defendant Morales' arrest. Mr. Suárez took all this data and reduced it to

an Excel spreadsheet as to incoming and outgoing calls.  He then used the data as to the cell

sites location and presented the former and the latter chronologically.

Mr. Suárez testified on direct examination as to several cell phone calls for the device

at issue, the one that belongs to Agent Concepción-Ramos' father, indicating their time, if

it was an incoming or outgoing call and which cell site tower it hit at the time.

Notwithstanding, the testimony concluded that such information would not tell where the

cell phone at issue was but rather the vicinity of such cell phone.  At times the cell phone

was shown to have pinned off the Cupey area cell sites and at other times in the cell sites of

Puerta de Tierra, all the way to San Juan.  The Cupey area had several cell sites to include

Paseo Cupey, Micro II outdoor or Cupey II and Colinas de Cupey.  (Exhibits K, L and M).

On cross-examination, Mr. Suárez indicated he cannot tell the precise location of the

cell phone at issue by looking at the historical data.  What a cell site tells is which tower  a

particular cell phone was using at a particular time.  Based on Mr. Suárez' analysis of

February 22nd, the tower used that morning was the one of Puerto de Tierra, then it moved

to Cupey, where it stayed for about an hour and then back to Puerta de Tierra, but based on

this analysis he does not know who had the cell phone.  Agent Concepción-Ramos worked

at "Comandancia", its San Juan Headquarters, near Puerta de Tierra, while Jardines de

Cupey Public Housing Project is located in the area of Cupey.  Said testimony for February

22nd, even if it would have established that Agent Concepción Ramos had said cell phone

with him, establishes indeed what was testified in regards with the surveillance of Building 7, Apartment #77.

In re-direct examination, Mr. Suárez clarified that during his investigation he was initially under the impression that, as it is usual in the continental United States, if a cell site is busy, the call would bounce to another cell site.  However, in Puerto Rico, such premise is incorrect for it was learned from Claro that a cell phone call would not actually connect when the cell site is busy.  What Mr. Suárez attempted to establish in regard with the information as to cell phone calls and the cell site towers is that the phone at issue showed no hit in any cell site in Cupey after 1:00 p.m. of February 22, 2012.

In addition, defendant Morales offered the testimony of Mr. Ricardo Matos-Acosta, a manager and engineer of radio frequency for Claro, to testify as to his analysis of the records from Claro cell phone company.  Said testimony was presented regardless that defendant Morales did not establish whether Agent Concepción-Rojas had indeed a cell phone with him on the days of the surveillance.  The basis of Mr. Matos-Acosta's testimony was the historical data received so as to show the cell phone hits to the connecting cell towers in the Google map within the vicinity of  the cell towers location. (Exhibits QQ, SS, WW, and XX).

After *voir dire*, Mr. Matos-Acosta was considered qualified as an expert in regards with Claro's technology and how the network works.  Mr. Matos had the coordinates of the towers, GPS technology and the data base.  Through the use of Google Earth, which is more precise as to the location of the cell site towers, he identified the sectors these were pointing

United States of America v. Ernesto Morales Castro
Criminal No. 12-229 (FAB)
Report and Recommendation
Page 14

at and what coverage provided each sector.   There are around 600 radio bases in the island of Puerto Rico that make up three sectors and each sector has a specific coverage.   Exhibit K.

Engineer Matos-Acosta further testified that a cell site covers more or less a two miles distance in the metropolitan area and much more in the rural areas but the coverage of each cell site may vary.   Factors to be considered as to their coverage, among others, depend on the terrain, the height of the antenna, the power of the radio base station, and how much power is transmitted.   If the cell site is jammed for being too busy, the call will be blocked.   A general explanation as to what was the distance between cell sites was given which at times was referred as 2.41 miles, such as the one of De Diego 444 building, and as to the Cupey II cell site it was 5.57 miles.   When asked to indicate from where a cell phone calling from Trujillo Alto would have coverage, from what cell site, the witness indicated he would not dare to answer, meaning it could come through any of the three sectors.   Neither could he indicate what location exactly the call came from, for it could be far, in the border or in the middle of the range of the cell site towers.   As such, since Mr. Matos-Acosta would not know the location or the distance, he could not tell if the cell phone call would go to another cell site or to a completely different cell site.   He further explained that if there was already a cell phone call going on, the call could pass from one cell site to another for it already had an open channel.   The coverage of the sector would depend, for there are factors such as the height of the tower, the power, the tilt of the antenna, and there are optimal ways that could reduce, increase the coverage, depending of the needs of the cell phone

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 15

company at the time.  As to Puerta de Tierra in particular, Mr. Matos-Acosta testified it is difficult to know the coverage area for there is also the cell site of Old San Juan, for there are two sectors pointing to San Juan.  On the historical record available, contrary to prospective (live) cell cite information regarding the cell phone at issue, it would be difficult to tell with some degree of accuracy,  how far away the device –the cell phone– was to each particular cell site tower.

On re-direct examination, Mr. Matos-Acosta remembered having met with Mr. Suárez and talked about the distance of the cell sites and that he took notes.  He also spoke with defense counsel for defendant Morales.  It was indicated that, as to the cell site in Cupey, he could not tell if coverage extended ten or twenty miles for there are particular reasons in the network that more distance could be reached; among them, if there was anything out of service, if there were a lot of cells out of service, and if the call was placed from within a building on the tenth floor.  However, these events would not happen frequently, about once a month.  Mr. Matos-Acosta testified that it is probable that a cell phone call from Cupey could hit a cell tower in Puerta de Tierra.

On re-cross examination, Mr. Matos-Acosta clarified that if the signal was good enough and there were no cell sites near, a cell phone call could be maintained if the person is continually moving in a vehicle from one area towards the area of Cupey.

Finally, on the issue of cell phone calls, defendant Morales presented the testimony of Sergeant Javier Vázquez who works as a San Juan Municipal Police Sergeant as part of the Task Force in the Criminal Information Division where at times Agent Concepción-

Ramos would be under his direction.  He worked some six months before, by February 22, 2012, with Agent Concepción-Rojas at the Jardines de Cupey Public Housing Project.  On said date, Sergeant Vázquez could have used the same cell phone he presently has.  At the request of defense counsel, he then circled on Exhibit K said telephone number as his number.  Sergeant Vázquez does not remember having worked on March 10th and although he appears in the entry log of the office for March 11th, Sergeant Vázquez does not recall working that day nor does his cell phone number appears in the toll record presented for said date.[9]

> ### B.    Discussion.

The record of documents produced from Claro shows that said cell phone company was served with a subpoena issued by defense counsel and it produced all the historical toll records and information on the requested law enforcement agent and his relatives, as well as all subscribers' information available.  Through these testimonies and records, defendant Morales attempted to establish as grounds for suppression, the scientific analysis of toll records indicated Agent Concepción-Ramos was not at the place he alleged to be while doing surveillance under the subjective premise that it was rather the informant who made the observations and provided all the information contained in support of the state warrant.

Defense counsel proposed for the first time in the memorandum of law in support of the hearing that this court is to follow the Occam's razor theory.  However, we do not

---

[9] The government presented the testimony of ICE Agent Luis Fombellida who obtained defendant's waiver of rights and consent for the search of the vehicle at "la Comandancia."  This testimony will be discussed further below.

know enough about the causes of variations to be rigidly bound by the Occam's razor theory proposed by counsel for defendant.[10] Occam's razor maxim is defined as "the philosophic rule that entities should not be multiplied unnecessarily." Webster's Third New International Dictionary (Unabridged) 1561 (Philip B. Grove, ed. in chief, 1981).

Rather, on the multiplicity of factors evidenced by the testimonies before this Court, defendant Morales rather presents before this Court support under a Macey's razor maxim to support the request for suppression. Macey's dictates that when multiple explanations for the same governmental action exist, one must select the most cynical explanation. Under such cynical explanation, it is then believed the government action is worse than it actually is. *See* Jonathan R. Macey, *Cynicism and Trust in Politics and Constitutional Theory,* 87 Cornell L. Rev. 280 (2002).

Notwithstanding, the Court rather selects to weigh and evaluate the evidence as presented, and in so doing defense counsel's assertions are not supported by a preponderance of the evidence nor have these raised significant doubts which may favor suppression. *See also* Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp.,75 F.3d 1057, 1061 n.10 (5th Cir. 1996).

For a search warrant to be voided and the fruits of the search excluded, a defendant must (1) show that the affiant made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make that showing by a preponderance of the evidence,

---

[10]  Occam's razor is a 14th century maxim otherwise recognized as the law of parsimony, economy or succinctness. The maxim is summarized in that among competing hypotheses, the one that makes the fewest assumptions should be selected.

and (3) show that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.  United States v. Tzannos, 460 F.3d 128 (1st Cir. 2006); *see also* Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674 (1978).

Defendant Morales herein has been unable to establish that Agent Concepción-Ramos' sworn statement in support of the state search warrant for Building 7, Apartment #77, was false or was made with reckless disregard for the truth.  To prove reckless disregard for the truth, a defendant may prove that the affiant "in fact entertained serious doubts as to the truth" of the allegations. United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984) (agreeing with United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979) (holding that the First Amendment definition should be applied by analogy in the Franks setting); *see also* Beard v. City of Northglenn, 24 F.3d 110, 116 (10th Cir. 1994) (same). Recklessness may be inferred "from circumstances evincing obvious reasons to doubt the veracity of the allegations." Williams, 737 F.2d at 602.

The grounds asserted by defendant Morales in regard with the alleged falsity of Agent Concepción-Ramos' sworn statement were predicated on the claimed discrepancy of the cell phone location at issue in relation with the cell site towers it would hit on the dates of the surveillance so as to establish Agent Concepción-Ramos could not have been at the site of the surveillance.[11]   As such, initially, defendant Morales made a substantial

---

[11]   Defendant Morales' reply to the government's opposition to a hearing included a discussion as to Agent Concepción-Ramos' statements (Exhibit A), the cell phone records that allegedly would establish that on the dates and between the hours attested by Agent Concepción-Ramos in his state affidavit in support of the search warrant  he was at a different location (Exhibit B), the availability of expert testimony on such records and the affidavit of Mr. Dennis Suárez and state incident reports as to recovery of evidence that was claimed not consonant with Agent Concepción-Ramos' statement (Exhibits C and D).

preliminary showing in its motion to suppress in that a false statement knowingly and intentionally was included by the affiant in the state search warrant affidavit and such statement was necessary for a finding of probable cause for the state magistrate to issue same.  Under such initial contention, the Frank's hearing was granted.  United States v. Andrea, 648 F.3d 1 (1st Cir. 2011).

The post-hearing discussion in defendant's memorandum submits that defendant Morales construed from the evidentiary hearing sufficient evidence to establish, through the cell phone toll records and the cell site coverage provided by Claro's cell towers, that Agent Concepción-Ramos was not in the surveillance area attested to in the state sworn statement.  Notwithstanding such an assertion, the evidentiary hearing failed to sustain defendant's proposition in support of suppression of the evidence.

First and foremost, Agent Concepción-Ramos testified in direct having no recollection whether on the dates he conducted the surveillance he had the cell phone at issue.  Secondly, the cell phone in question is not one provided to law enforcement agents or to Agent Concepción-Ramos but rather is one registered to his father, Mr. Carlos Concepción-Rojas. The toll record presented by defendant Morales in support of suppression from "Claro" clearly shows the cell phone is under the name of Mr. Concepción-Rojas, Agent Concepción-Ramos' father.  (Exhibit J).  Agent Concepción-Ramos also testified he uses at times said cell phone but not during surveillance for he avoids the use of a cell phone so not to be distracted and when needed he communicates with other agents nearby through a hand radio. The testimony of Agent Concepción-Ramos

was that he did not remember if during those days of surveillance he indeed had said cell phone. Additionally, the testimony of "Claro" officer failed to establish the cell coverage proffered by defendant Morales that Agent Concepción-Ramos could not have been where he attested to in the sworn affidavit before state judge, even if he indeed carried the cell phone on those dates. Neither did it establish if the calls therein registered had been answered by someone or if these went directly to voice mail or if when received said cell phone was being carried by someone else[12] and was indeed in the area alleged by counsel for defendant that was to be established by the cell site towers that registered those calls.

In conclusion, during the Franks hearing defendant failed to meet his burden of proof by preponderance of the evidence to show that the statements of Agent Concepción-Ramos in the affidavit in support of the search warrant were false and were made knowingly and intentionally with reckless disregard for the truth as required by Franks, 438 U.S. at 156. Defendant's evidence did not establish with any accuracy nor by preponderance of the evidence that Agent Concepción-Ramos had the cell phone in question with him while conducting the surveillance. The toll records nor any other evidence presented at the hearing can show either with reliability that Agent Concepción-Ramos was not at the location where he conducted the surveillance. In addition, the evidence did not establish who had the cell phone, when and where was the cell phone at issue during the dates of

---

[12] Even when having Sergeant Vázquez in the witness stand, counsel did not propose any question of whether the circled phone calls identified from the toll record as belonging to Sergeant Vázquez' cell phone resulted in any live conversation with Agent Concepción-Ramos or if a voice message was left for said attempted communication or if the same had been returned.

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 21

surveillance for the property at Building 7, Apartment #77.  The toll records only show that someone used the cell phone on the specified dates and times.  After accessing credibility[13] and in the absence of any significant contradiction as to the statements contained in the sworn application for the search warrant, defendant's attempt to present a Frank's assessment has failed and there are no valid grounds for suppression.

## B.  Search of Defendant Morales' Vehicle.

### 1.  Fruit of the Poisonous Tree.

Evidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation so as to render such evidence inadmissible as fruit of the poisonous tree.  The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.  *See* United States v. Camacho, 661 F.3d 718 (1st Cir. 2011).

Defendant Morales initially attempted to argue that, upon prevailing in the allegations of lack of probable cause for the state warrant because of the alleged misleading

---

[13] A district judge should not tamper with the credibility determinations made by the Magistrate Judge. See United States v. Raddatz, 447 U.S. 667, 681 n. 7, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (noting that when the issue involves credibility, it is unlikely that a district judge would reject the magistrate's views and substitute his own appraisal); *see also* National Railroad Passenger Corp. v. Koch Industries, Inc., 701 F.2d 108, 111 (10th Cir.  1983) (holding that "only in a rare case should a district judge resolve credibility choices in a manner contrary to recommendations of magistrate who heard witnesses' testimony").  The findings of the court after a hearing on a pretrial motion to suppress are binding unless they are clearly erroneous. United States v. de Jesús-Ríos, 990 F.2d 672, 677 (1st Cir. 1993); United States v. Hernández-Rodríguez, 443 F.3d 138 (1st Cir. 2006) (credibility determinations in a report and recommendation should not be rejected by the Court without hearing the evidence examined by the Magistrate Judge); United States v. Núñez-Torres, 601 F.Supp2d 388 (D.P.R. 2008) (same).

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 22

or false information contained in Agent Concepción-Ramos' statement, the subsequent search of the vehicle should also be suppressed as fruit of the poisonous tree.  As a consequence, having already discussed no such evidence supports defendant Morales' grounds to suppress under the evidence presented regarding the Frank's hearing, there is no need in theory to elaborate on such a doctrine insofar as the evidence retrieved from defendant's vehicle.

Additionally, counsel for defendant Morales indicated during the evidentiary hearing she would  waive the submission as to the waiver or consent for the search of the vehicle for which the government need not present its evidence.

However, the government decided to present evidence claiming the items seized during the search of the vehicle is not the fruit of the poisonous tree.

### 2.    Consent to Search the Vehicle.

Notwithstanding above stated defendant's waiver, the government called HSI SA Fombellida to the stand.  SA Fombellida participated in the case and in the search of defendant's vehicle, after the state or local authority detained defendant Morales subsequent to the search of the residence at Building 7, Apartment #77.[14]

SA Fombellida testified he went to the Hato Rey West Police Station where defendant Morales was detained on March 21, 2012, and after consulting with an Assistant United States Attorney determined to adopt the case for federal prosecution.  On said date,

---

[14]   The search of the residence had no participation from ICE or federal agents inasmuch as it was an operation of the Puerto Rico Police.

SA Fombellida found two persons detained at the police station, defendant Morales and his wife.  SA Fombellida then explained defendant Morales his rights, gave him Miranda warnings and provided a written form in the Spanish language on which defendant Morales initialed each line. (Waiver of Rights, Exhibit 6).  Defendant Morales was very calm and basically understood everything he was told.  They held a casual conversation, nothing like a typical interview during an arrest about the things that had been found at his residence. Defendant Morales explained the pills retrieved by state agents were for his personal use for he had pain in his right shoulder, although he did not have a prescription for these were bought on the streets.  SA Fombellida also proceeded to interview defendant's wife.  Once they were ready to leave and transport defendant out of the police station, SA Fombellida was informed that defendant Morales would grant consent for the search of a vehicle which was located at the Puerto Nuevo Comandancia premises where a K-9 alerted positive for such vehicle and where it had been detained for investigation.  Once at the Comandancia, SA Fombellida provided defendant Morales a written consent form as to which Agent Concepción-Ramos obtained defendant's signature while defendant Morales was also accompanied by one Neftalí, whose last name he does not recall, and indicated he was defendant's legal representation. (Consent to Search, Exhibit 7).  Defendant Morales remained close to the vehicle while the search of the vehicle was conducted after the consent.

SA Fombellida noticed after a few minutes there was some sort of a trap door which opened automatically through hydraulics and inside there were many weapons, including

United States of America v. Ernesto Morales Castro
Criminal No. 12-229 (FAB)
Report and Recommendation
Page 24

two M-4 automatic rifles, handguns, some with obliterated serial numbers, an adapter for

an M-4 grenade launcher, ammunition, Glock magazines and cash. (Exhibits 8-12).

Defendant Morale's vehicle was searched, without a warrant for which a warrantless search

would violate this Fourth Amendment right  unless the search comes within one o  a "few

specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412

U.S. 218, 219, 93 S.Ct. 2041 (1973) (quoting Katz v. United States, 389 U.S. 347, 357  88

S.Ct. 507 (1967)).  A warrantless search is unreasonable under the Fourth Amendment

unless one of the recognized exceptions to the warrant requirement applies.   One of those

exceptions is a search undertaken with consent.

The government has established defendant Morales provided a knowing written,

voluntary and valid consent to search his vehicle.  Proof of valid consent to search requires

that the prosecution show, by a preponderance of the evidence, that the consent was

knowingly, intelligently, and voluntarily given. United States v. Marshall, 348 F.3d 281 (1st

Cir. 2003).  In the present case, defendant Morales waived the objection as to the waiver.

Regardless, there is no evidence that would otherwise establish the consent for the searc

of the vehicle was other than voluntary and knowing.

**CONCLUSION**

In accordance with above discussion, it is recommended that defendant Morales'

Motion to Suppress be DENIED.  (Docket No. 26).

United States of America v. Ernesto Morales Castro
Criminal No.  12-229 (FAB)
Report and Recommendation
Page 25

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.  Amended Fed. R. Crim P. 59 (b)(2).  *See also* Amended Local Rules. Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986). *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

IT IS SO ORDERED.

San Juan, Puerto Rico, this 7th day of November of 2012.

S/ CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED   STATES   MAGISTRATE   JUDGE